UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO.:   16:-cv-166 (WOB-CJS)

RUSSELL V. POPE                                                          PLAINTIFF

VS.                         **MEMORANDUM OPINION AND ORDER**

TERRY CARL                                                               DEFENDANT
(IN HIS INDIVIDUAL CAPACITY)

I.   INTRODUCTION

This civil rights action is brought under 42 U.S.C. § 1983 to redress alleged First and Fourteenth Amendment violations, as well as state law claims for retaliation and intentional interference with a business relationship. Southern Health Partners ("SHP") terminated Russell V. Pope ("Plaintiff"), a nurse assigned to the Kenton County Detention Center ("Detention Center"), after the Detention Center locked Plaintiff out of its facility after Plaintiff filed a grievance in response to a co-worker's promotion. Plaintiff has settled with SHP. Plaintiff has now brought suit against Kenton County Jailer Terry Carl ("Defendant" or "Jailer") solely in his individual capacity.

The matter is before this Court on Defendant's Motion for Summary Judgment. (Doc. 20.) Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1337. Having reviewed the matter, and being sufficiently advised, the Court now issues this Memorandum Opinion and Order.

## II.     SEALED DOCUMENTS

At the outset, the Court recognizes that several documents were filed under seal pursuant to a March 2017 agreed protective order because they are related to a separate action filed in Kenton County Circuit Court. (Docs. 12, 21, 26, 28, 31.) The Court now unseals these documents in support of this opinion and order.

"Secrecy is fine at the discovery stage, before the material enters the judicial record." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *Baxter Int'l Inc. v. Abbott Labs*, 297 F.3d 544, 545 (7th Cir. 2002)). Thus, the Court may enter a protective order limiting the use of discovery materials upon a mere showing of "good cause." *Id.*

"At the adjudication stage, however, very different considerations apply." *Id.* (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)). "Unlike information merely exchanged between the parties, the public has a strong interest in obtaining the information contained in the court record." *Id.* (internal quotations and citations omitted). Therefore, courts recognize "a strong presumption in favor of openness" of court records. *Id.*

In civil litigation, "only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is typically enough to overcome the presumption of public access." *Id.* at 308 (internal quotations and citations omitted). A court's obligation to adhere to the above principles is independent of whether any party objects . . . . *Id.* at 306.

The documents previously sealed pursuant to the Court's March 2017 agreed protective order do not fall within any areas where public access to these records should remain foreclosed. Accordingly, the Court unseals these documents.

## III. FACTUAL & PROCEDURAL BACKGROUND

SHP, a Delaware corporation, is a health-care contractor that provides medical, dental, and mental health services to a variety of correctional facilities across the United States. (Doc. 20-2, PageID# 1.) From September 2012-September 2015, SHP employed Plaintiff, a licensed practical nurse, and assigned Plaintiff to the Detention Center which had contracted with SHP to provide medical services. (Doc. 24-2, Pope Dep., PageID# 899-900.) Throughout his tenure at SHP, Plaintiff received positive employment reviews and had no other employment-related issues at the Detention Center. (Doc. 24-3, Carl Dep., PageID# 112-113.)

On September 10, 2015, Shawnee Thoman ("Thoman"), SHP's Regional Representative and Plaintiff's immediate supervisor, informed the SHP Detention Center medical staff that Shawn Sims ("Sims"), Plaintiff's co-worker, had been appointed supervisor for that location. (Doc. 24-2, Pope Dep., at 928.) Plaintiff learned of Sims's promotion after reading Thoman's memorandum when Plaintiff next reported to work. (*Id.* at 858.)

Plaintiff was dissatisfied after learning of Sims's promotion for several reasons. First, Plaintiff explained that Sims possessed only one year of experience compared to Plaintiff's three years and that Plaintiff's most recent employee performance review rated him at one-hundred percent in every category. (Doc. 24-3, Carl Dep., at 1137.) Plaintiff maintained that this employment action was discriminatory because Plaintiff was "also very qualified for the position and was not offered the chance to apply . . . . ." Second, Plaintiff felt that Sims's prior unsavory conduct at work did not justify the promotion in light of the fact that Plaintiff had partially trained Sims and had stressed that unprofessional conduct was not acceptable. (Doc. 24-2, Pope Dep., at

3

864.) Third, plaintiff claimed that Thoman promoted Sims based on their friendship. (*Id.* at 878.) Last, Plaintiff asserted that SHP had surreptitiously made the promotion in violation of company policy regarding publicly announcing available opportunities. (*Id.* at 866.)

On September 16, 2015, Plaintiff e-mailed Katie Utz ("Utz"), SHP's Vice-President of Human Resources, a formal complaint regarding Sims's promotion. (Doc. 24-3, Carl Dep., at 1136-42.) In his grievance, Plaintiff reiterated the above complaints and also expanded the grounds of his disapproval. The grievance contains twelve numbered paragraphs outlining Plaintiff's disagreement with SHP over its decision to promote Sims. Of these twelve paragraphs, three directly address Plaintiff's advocacy for his own promotion and an internal investigation into the hiring decision:

> 4- [Sims] has approx. 1 year of nursing experience and I have over 3 years of nursing experience.
>
> 5- My most recent employee performance review has me rated at 100 percent in every category.
>
> 6- I walked into the unit recently and was directed to the enclosed decision by . . . Thoman that . . . Sims had been promoted to "Supervisor" without any chance for anyone else on the unit to apply for that position. This is discriminatory due to the fact that I am also very qualified for the position and was not offered the chance to apply according to policy and procedure listed in the employee handbook.

(*Id.* at 1137.)

Plaintiff then levied allegations of age and racial discrimination and sexual harassment by Sims in two paragraphs and four attached documents. Those allegations assert the following:

> 6- I believe [Sims] was chosen because he is younger and is close friends with [Thoman] outside of work. This leads me to believe that this is an age discrimination issue.

4

> 7- Enclosed are several attachments to support my additional complaint of harassment. I have been personally harassed by . . . Sims, and [Thoman] has told [Sims] on several occasions to stop. . . . [Sims] was told by [Thoman] that putting pictures up on the unit portraying Spanish people pushing maid carts was unacceptable. The attached have been used as screen savers on the unit for months. . . . I believe that this incident has created a hostile work environment not just for me, but for several employees on the unit.

(*Id.*)

The grievance's four attachments expand upon Plaintiff's sexual harassment allegations. As described above, they include:

> 1- A work-related note allegedly composed by Sims and subsequently shared with Plaintiff. In the note, Sims disparaged a Detention Center's information technology employee using offensive language to describe the employee's personality, living arrangements, and hobbies.
>
> 2- An electronically-sketched penis drawing, originally created by a Detention Center deputy in 2013, and used as a screen saver through 2014. Under the drawing, Sims allegedly added Plaintiff's first name to create the phrase "Russell LOVE[S] THE COCK."
>
> 3- A Sims-generated "glamour shot" of Plaintiff circulated to the Detention Center's staff.[1]
>
> 4- A photograph of an unidentified man and woman in a provocative sexual pose captioned as "engagement photo" that included the phrase "Mi cocka su cocka" beneath it.

(*Id.* at 1140-42.)

On September 17, 2015, Utz responded to Plaintiff's complaint detailing SHP's response. (*Id.*). Ultimately, SHP justified Thoman's actions by distinguishing Sims's new responsibilities from a full promotion. (*Id.*) In SHP's view, Sims had simply been assigned additional job duties in specific areas, but had not been fully promoted emphasizing that Plaintiff would not report to Sims per the new arrangement. (*Id.*) SHP further indicated that Plaintiff and fellow co-workers

---

[1] In this context, a "glamour shot" refers to an enhanced photograph of an individual in an unflattering pose which can be used to embarrass or amuse.

were aware of the jocular nature of Sims's actions, participated in the workplace jokes, and that these complaints had only been raised following Sims's promotion. (*Id.*) SHP clearly indicated that all Detention Center staff members are aware that such conduct is inappropriate and re-training would occur in the following days. (*Id.*)

That same day, a conference call was held with Plaintiff, Utz, Thoman, Detention Center Colonel Michael Jones ("Jones"), and other SHP personnel to discuss the results of SHP's investigation. (Doc. 24-4, Thoman Dep., PageID# 1224, 1227.) Plaintiff walked out on the conversation before its completion. (*Id.* at 1226.)

Defendant testifies that this disturbance was sufficient enough to upset two female nurses working in the nearby medical unit. (*Id.* at 131-33.) Alarmed by Plaintiff's conduct, both nurses became uncomfortable with the prospect of working with Plaintiff and informed Thoman that they wished to leave for the day. (*Id.* at 1231, 1233; Doc 24-8, Tate Dep., PageID# 1409.) A dilemma arose. With one nurse absent on maternity leave, allowing the two nurses to depart for the day would leave SHP understaffed and unable to satisfy its contractual obligations to the Detention Center.[2] (Doc. 24-4, Thoman Dep., at 1248.)

Thoman consulted with Defendant and Jones about the dilemma regarding the nurses in light of the fact that the jailer and his staff make security and operational decisions that impact inmate health and well-being. (*Id.*) The jailer indicated that he was concerned about medical unit staffing given the unfolding situation and, in consultation with Jones and the nurses, decided to deny Plaintiff access to the Detention Center by revoking Plaintiff's security clearance

---

[2] Plaintiff denies that he was ever disruptive. Defendant testifies that Plaintiff lost his temper and caused a commotion. Therefore, since the non-moving party is entitled to the benefit of all inferences including that Defendant's actions were motivated by the sexual harassment complaints, the Court will assume for purposes of this motion that no disturbance occurred. *See* discussion, *infra*; (Doc. 21-1, Pope Dep., PageID# 657); (Doc. 24-3, Carl Dep., at 1057.)

temporarily. (*Id.* at 1261-62; Doc. 24-6, Jones Dep., PageID# 1371.) Jones escorted Plaintiff to the jail's exit and while en route stated to Plaintiff that Defendant was upset that Plaintiff had revealed that a jail deputy had originally created the penis screen saver drawing. (Doc. 24-2, Pope Dep., at 902.) Detention Center personnel concluded the matter by transmitting an e-mail to prison and SHP employees indicating that Plaintiff had been temporarily prohibited from accessing the Detention Center. (Doc. 1-3.)

Plaintiff assumed that Defendant and Jones's conduct amounted to a termination since he lost his security clearance to the Detention Center with no return date indicated. (Doc. 24-2, Pope Dep., at 870, 872, 875.) However, SHP did not formally terminate Plaintiff at this time. (*Id.* at 839-40.) Plaintiff proceeded to file for unemployment benefits on September 22, 2015. (*Id.* at 933.)

On September 24, 2015, Detention Center personnel notified Utz that Plaintiff's security clearance suspension had been altered from temporary to permanent. (Doc. 1-4.) SHP ultimately terminated Plaintiff's employment at some point thereafter. (Doc. 24-2, Pope Dep., at 873.) Plaintiff received unemployment benefits for approximately four months eventually obtaining a higher paying nursing position with the Veterans Administration in Fort Thomas, Kentucky. (*Id.* at 795.)

Plaintiff initially sought redress by bringing a wrongful termination and retaliation suit against SHP in Kenton County Circuit Court and settled that matter on August 26, 2016. (*Id.* at 920.) On September 14, 2016, Plaintiff filed the present action in this Court seeking an additional $14,489.20 in lost wages and overtime and $450,000 in compensatory and punitive damages. (Doc. 1 at 8.)

## IV. LEGAL STANDARD

Summary judgment remains appropriate "if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party shoulders an initial burden to identify "those portions of the pleadings . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant satisfies its initial burden, the opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). When a defendant moves for summary judgment, as in this matter, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court considers evidence "in the light most favorable to the non-moving party." *Id.* at 255.

When a summary judgment motion is based on a qualified immunity defense, as here, a modified analysis applies. In these situations, the existence of a disputed and material fact does not outrightly foreclose summary judgment. *See Woosley v. City of Paris*, 591 F. Supp. 2d 913, 918 (E.D. Ky. Dec. 2, 2008). In these instances, even if a material fact is in dispute, summary judgment is appropriate if the Court determines that the plaintiff has failed to establish a violation of a clearly-established constitutional right when analyzing the facts most favorably to this party. *See id.*; *see also Pearson v. Callahan*, 555 U.S. 223 (2009).

## V. PLAINTIFF'S CONSTITUTIONAL & STATE LAW CLAIMS

Plaintiff alleges that Defendant violated Plaintiff's First and Fourteenth Amendment rights during the events that preceded Plaintiff's termination. First, Plaintiff avers that he possessed a constitutionally-protected right to express concerns related to the Detention Center's operation and that Defendant unlawfully retaliated against Plaintiff for exercising his First Amendment rights when Plaintiff's security clearance was revoked. (Doc. 1 at 6.) Second, Plaintiff contends that Defendant's alleged retaliatory acts amounted to a Fourteenth Amendment equal protection violation since he was discriminated against for asserting a sexual harassment complaint. (*Id.*) Last, Plaintiff brings a retaliation claim under K.R.S. 344.280(1) and also an intentional interference with a business relationship claim under Kentucky law. (*Id.* at 6-8.)

### A. Plaintiff's Section 1983 First Amendment Retaliation Claim

To state a claim under § 1983, "a plaintiff must allege that he was deprived of a right secured by the Federal Constitution or laws of the United States by a person acting under the color of state law." *Paige v. Coyner*, 614 F.3d 273, 278 (6th Cir. 2010) (internal quotations and citations omitted). The parties do not dispute that Defendant was acting under the color of state law when he temporarily revoked Plaintiff's security clearance. The issue is whether Defendant violated Plaintiff's First and Fourteenth Amendment rights in doing so.

To establish a First Amendment retaliation claim under § 1983, a plaintiff must demonstrate that:

> (1) he engaged in constitutionally protected speech or conduct;
>
> (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and]
>
> (3) there is a causal connection between elements one and two----that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). Since Plaintiff is unable to show a genuine issue as to whether his speech was protected by the First Amendment, this Court need not address the second and third elements of this inquiry. *See Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988) ("If the plaintiff's speech did not address a matter of public concern, no further inquiry is necessary."); *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987); *Portinga v. Taylor*, No. 1:07-cv-1208, 2009 WL 910800, at *14 (W.D. Mich. 2009) (declining to reach the adverse action and causal connection elements where a plaintiff had failed to prove their speech involved a matter of public concern).

### i. Constitutionally Protected Speech

A critical threshold issue raised by this case is whether Plaintiff can be considered a public employee since SHP, a private medical contractor, directly employed him and assigned him to the Detention Center. Supreme Court precedent directs this Court to treat independent contractors as akin to government employees since contractors "are similar in most relevant aspects to government employees, although both the speaker's and the government's interests are typically–though not always-somewhat less strong in the independent contractor case." *Bd. of Cnty. Com'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 684 (1996). Thus, the same analysis applies and Plaintiff is properly considered a public employee. *Id.* at 685.

The principal issue raised by Plaintiff's First Amendment claim is whether Plaintiff's grievance e-mail amounted to protected First Amendment activity. For an answer to this question, courts apply a three-step inquiry. A public employee's speech warrants First Amendment protection if the employee can demonstrate the following elements:

> (1) the speech was made as a *private citizen*, rather than pursuant to his official duties;
>
> (2) the speech involved a matter of public concern; and
>
> (3) the employee's interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in "promoting the efficiency of the public services it performs through its employees."

*Garcetti v. Ceballos*, 547 U.S. 410, 417-18 (2006) (citation and internal quotation marks omitted) (emphasis added); *see also Westmoreland v. Sutherland*, 662 F.3d 714, 718-19 (6th Cir. 2011) (citing *Garcetti*, 547 U.S. at 417). Again, this Court only addresses the first two prongs of this analysis as Plaintiff's inability to prove that he spoke as a private citizen obviates the need for further balancing as outlined in *Pickering v. Bd. of Educ. of Twp. High School Dist. 205, Will Cnty. Ill.*, 391 U.S. 563 (1968). *See Rankin*, 483 U.S. at 384-85; *Portinga*, 2009 WL 910800, at *14 (declining to apply *Pickering* balancing where a plaintiff failed to demonstrate that their speech involved a matter of public concern).

### ii. Speech as a Private Citizen

Turning to the issue of whether Plaintiff's speech was made as a private citizen or in conformity with his employee responsibilities, it is critical to acknowledge at the outset that Plaintiff's opposition memorandum (Doc. 24.) does not address Defendant's argument that Plaintiff engaged in this speech pursuant to his public duties. As a practical matter, "it is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Rouse v. Caruso*, No. 6-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011). Accordingly, Plaintiff's First Amendment claim may be dismissed for failure to address Defendant's argument on this point.

But Plaintiff's claim also fails on the merits. The First Amendment does not protect a public employee from employer discipline when the employee engages in speech pursuant to his official duties. *Garcetti*, 547 U.S. at 421. Rather, the employee must speak as a citizen and reference matters of public concern for his or her statements to garner First Amendment protection. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007).

*Garcetti's* essential inquiry "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). The Sixth Circuit has explained and confirmed that *Lane's* clarification of *Garcetti* means that speech which "owes its existence to a public employee's professional responsibilities must be read *narrowly* as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (emphasis added); *see also Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348-49 (6th Cir. 2010) (concluding that a teacher's complaints to her supervisors that her class sizes were too large amounted to unprotected speech as a public employee); *Weisbarth*, 499 F.3d at 540 (holding that a park ranger's conversations with a personnel consultant were "ad hoc or de facto duties" of her job, and, therefore, the ranger made those statements as an employee and not as a citizen); *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 364 (6th Cir. 2007) (determining that a memorandum transmitted from a police officer to his supervisor about the propriety of a staff reduction constituted part of a general duty to communicate internally and was unprotected speech).

Here, Plaintiff has admitted that his statements were made pursuant to his duties to his employer, SHP. When asked "[d]id you feel like it was your responsibility as a tenured nurse to tell them what you knew?", Plaintiff responded "Yes." (Doc. 24-2, Pope. Dep., at 628.) His own

12

deposition testimony frames his 2015 grievance as one made in his employee capacity. Plaintiff acknowledges that his inclusion of his specific employee and location number was done only "if corporate was asking for paperwork or something that we had to send in . . . . That's an SHP thing that I understood." (*Id.* at 863.) He further admitted that this was typically done in his capacity as an SHP employee. (*Id.* at 887-888.) Indeed, no other component of the grievance indicates that Plaintiff intended to speak as anything but as an employee. The fact that Plaintiff transmitted this grievance from his personal e-mail account is not persuasive as Thoman testified that employee e-mail access was limited to the workplace restricting Plaintiff to communicating from a personal account. (Doc. 20-10, Thoman Dep., PageID# 254-55.) Accordingly, Plaintiff, himself, frames his speech as made in his employee capacity.

Next, the Court has considered the speech's audience and setting. Here, Plaintiff directed this e-mail solely to Utz in her capacity as SHP's Vice President of Human Resources. (Doc. 24-3, Carl Dep., at 1136.) That is because Plaintiff was, as he admits, "unable to file the complaint with the regional manager as the complaint involves both my MTA and regional as they are apparently the same person or position pertaining to . . . Thoman." (*Id.* at 1137.) As is evident, Plaintiff ran his grievance up the chain of command to attempt to secure an audience within the workplace for airing his disagreement about Sims's promotion.

Plaintiff's actions align with SHP's procedure for reporting sexual misconduct. Plaintiff's signed August 2015 "Sexual Misconduct/Prison Rape Elimination Act (PREA) Orientation form indicates that "staff . . . who become[ ] aware or reasonably suspect that . . . staff are involved in an unauthorized relationship ha[ve] an affirmative duty to immediately report any such knowledge or suspicion to the Jail Administration and SHP Risk Management Department by way of confidential means verbally or *written*." (Doc. 24-2, Pope Dep., at 934) (emphasis added.) While

the reporting procedure explicitly addresses only "unauthorized relationships", the document also includes a prohibition of sexual misconduct encompassing making sexual comments to staff members and implies that similar misconduct should be reported in an identical manner. (*Id.*)

As the Sixth Circuit has observed, "acting pursuant to an organization's accepted procedure for employee complaints tends to suggest that the person was acting pursuant to [his] job duties." *Keeling v. Coffee Cnty. Tenn.*, 541 F. App'x 522, 527 n.5 (6th Cir. 2013). It is of no moment that the procedure is outlined within a policy or personnel manual; simple knowledge and application within an unofficial organizational reporting structure, present here, is sufficient to suggest employee conduct. *Id.* Here, Plaintiff followed established procedure by advancing his grievance to management, indicating that he spoke as an employee in this situation.

Plaintiff's own admissions coupled with the speech's audience and setting confirm that he was acting as an employee pursuing a private matter and not as a citizen. In the grievance's closing lines, Plaintiff remarks that he did "enjoy working for SHP. I just feel that this needs to be known." (Doc. 24-3, Carl Dep., at 1138.) Thus, dissemination of the grievance's contents drove the speech, but only to the limited audience of a single member of upper management. Indeed, Plaintiff confirmed that he did not transmit his grievance to anyone other than Utz. When asked if he spoke to any Detention Center staff either after or before transmitting his complaint, Plaintiff responded "No." (Doc. 24-2, Pope Dep., at 859.)

Accordingly, the Court determines that Plaintiff spoke as an employee pursuant to his official duties and his grievance, thus, does not garner First Amendment protection. Because the Court has held that Plaintiff was not speaking as a citizen, it is unnecessary to address whether the speech otherwise involved a matter of public concern. *See Garcetti*, 547 U.S. at 418-19.

B.  **Plaintiff's Equal Protection Claim**

Plaintiff has also brought a Fourteenth Amendment claim alleging retaliation due to Plaintiff's complaint of pervasive sexual harassment at the Detention Center in violation of the Equal Protection Clause under Title VII of the Civil Rights Act of 1964 and § 1983.[3] (Doc. 1, PageID# 6); (Doc. 24, PageID# 783). This claim is deficient and must be dismissed.

Courts in this circuit have routinely recognized that actions involving retaliation claims for sexual harassment do not implicate the Equal Protection Clause. *See R.S.W.W. v. City of Keego Harbor,* 397 F.3d 427, 440 (6th Cir. 2005) (holding that a "pure or generic" retaliation claim does not arise under the equal protection clause); *Collins v. Allen*, No.: 1:04-cv-572, 2006 WL 2505928, at *2 (S.D. Ohio 2006) (recognizing that retaliation for filing a sexual harassment complaint did not implicate the Equal Protection Clause); *Strouss v. Mich. Dep't of Corr.*, 75 F.Supp.2d 711, 734 (E.D. Mich. 1999) (determining that no equal protection claim will lie for retaliation where plaintiff was disciplined for complaining about sexual harassment).

The right to be free from retaliation for making complaints involving discrimination is clearly established as a First Amendment right and a statutory right under Title VII, but no such right exists under the Equal Protection Clause. *See Ratliff v. DeKalb Cnty.*, 62 F.3d 338, 340 (11th Cir. 1995) (reversing a denial of qualified immunity on an equal protection claim because the right to free from retaliation for raising a discrimination complaint is clearly established under the First Amendment or Title VII). Since case law demonstrates that no equal protection claim can lie for retaliation, Plaintiff's Fourteenth Amendment claim is properly dismissed.

---

[3] This Court lacks subject matter jurisdiction to consider any retaliation violation brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et. seq., since no Equal Opportunity Commission ("EEOC") charge was filed in the matter. *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998) (holding that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly filed a claim in an EEOC charge).

### C. Defendant's Qualified Immunity

In light of the conclusion that Plaintiff was speaking as a private citizen in making his complaint about sexual harassment, it follows that the law was not clear to the contrary and that Defendant is entitled to qualified immunity. The qualified immunity doctrine insulates government actors from suit in their individual capacities for civil damages stemming from tortious acts committed while performing discretionary functions. *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 650 (6th Cir. 2015) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Immunity applies "[a]s longs as [the official's] actions *could reasonably have been thought consistent* with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (emphasis added). For the reasons already discussed, such is the case here.

### D. Plaintiff's State Law Claims

Having dismissed the federal law claims, the Court may exercise its discretion to dismiss the state law claims. 28 U.S.C. § 1367(c)(3). Kentucky law varies markedly from federal law with regard to the issues in this case, both as to the applicable substantive law and as to the immunity of public employees. The Court, therefore, in its discretion, dismisses Plaintiff's state law claims without prejudice, and Plaintiff may renew these claims in state court.

## VI. CONCLUSION

Therefore, having reviewed this matter, and the Court being sufficiently advised,

**IT IS ORDERED**:

    1.) The documents previously filed under seal (Docs. 12, 21, 26, 28, 31) be, and are hereby, **UNSEALED;**

2.) Defendant's motion for summary judgment (Doc. 20) is hereby **GRANTED** in accord with this Opinion;

3.) That the Plaintiff's federal claims, be, and they are, hereby **DISMISSED** with prejudice; and

4.) That the Plaintiff's state law claims be, and they are, hereby **DISMISSED** without prejudice, and may be re-filed in state court.

A separate judgment shall enter concurrently herewith.

This 29th day of August 2018.



Signed By:
William O. Bertelsman  WOB
United States District Judge